IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ALLEGHENY COUNTY PRISON                      Civil Action No. 21-cv-1537 (Lead)
EMPLOYEES INDEPENDENT
UNION (ACPEIU),
                              Plaintiff,

                                             Judge Cathy Bissoon

              vs.

COUNTY OF ALLEGHENY,
PENNSYLVANIA (COUNTY JAIL),

              Defendant.

_____

ALLEGHENY COUNTY POLICE                      Civil Action No. 21-1538 (Member)
ASSOCIATION,
                              Plaintiff,

              vs.                            Judge Cathy Bissoon

COUNTY OF ALLEGHENY,
PENNSYLVANIA (COUNTY JAIL),
              Defendant.
_____

### BRIEF IN SUPPORT OF MOTION TO DISMISS

Pursuant to FED.R.CIV.P. 12(b)(6), Allegheny County files this BRIEF IN SUPPORT OF MOTION TO DISMISS.

## TABLE OF CONTENTS

Facts ...................................................................................................................................3

A.      The COVID-19 Pandemic ....................................................................................3

B.      Allegheny County Policy ......................................................................................4

C.      Pending State Action before the Pennsylvania Labor Relations Board................4

D.      Consolidated Lawsuit ...........................................................................................5

Standard of Review .............................................................................................................6

Argument .............................................................................................................................7

I.      Federal Claims ......................................................................................................7

A.      No Cause of Action Under 9th Amendment...........................................................7

B.      No Cause of Action under 14th Amendment Equal Protection .............................8

C.      No Cause of Action under 14th Amendment Procedural Due Process ..................8

D.      No Cause of Action under 14th Amendment Substantive Due Process.................9

        1.      Public Employment is not a Fundamental Right ......................................10

        2.      Rational Basis Standard Met as Applied to Mandatory Vaccination Measures ..............11

E.      14th Amendment Shocks the Conscious Standard Not Met .................................13

F.      No Cause of Action Under Food, Drug, and Cosmetic Act.................................14

II.     State/Collective Bargaining Agreement Claims ..................................................16

A.      To Extent A State Claim is Asserted Court Must Abstain from Addressing it...................16

B.      Public Health, Safety, and Welfare Trump Collective Bargaining .....................18

C.      Pennsylvania Law Grants Allegheny County Authority for Vaccination Policy ................20

D.      A vaccine mandate is a managerial prerogative enforceable without bargaining. ..............22

        1.      Balancing test establishes vaccines are Act 195 managerial prerogatives. ....................22

        2.      Vaccine mandates don't unduly infringe bargaining rights of an Act 111 unit. ..............26

Conclusion .........................................................................................................................29

Certification of Compliance with Chambers Rules ...........................................................31

FACTS[1]

A.    **The COVID-19 Pandemic**

COVID-19 is caused by a novel coronavirus called SARS-CoV-2. (*See e.g.*, ECF 1-1[2], *ACPEIU Complaint*, ¶ 28,). This contagious disease is a respiratory illness that can affect other organs and spreads from close contact with infected people. *Id.* Individuals who contract COVID-19 have experienced a wide range of symptoms, from mild to severe illness. *Id.* As of September 30, 2021, there were a total of 43,349,211 confirmed cases of COVID-19 since the start of the pandemic. (*Id.* at ¶ 32). Since the emergence of the virus, three vaccines were developed and authorized for emergency use in the United States:

1. Pfizer-BioNTech COVID-19 Vaccine ("Pfizer"), an mRNA vaccine requiring two injections administered 21 days apart;
2. Moderna COVID-19 Vaccine ("Moderna"), an mRNA vaccine requiring two injections administered 28 days apart; and
3. Johnson & Johnson's Janssen COVID-19 Vaccine ("J&J"), a viral vector vaccine that requires one dose by injection.

(*Id.* at ¶¶ 31, 37, 42-55). The U.S. Food and Drug Administration ("FDA") fully approved the Pfizer vaccine on August 23, 2021, with the brand name of "Comirnaty." (*Id.* at ¶¶ 48, 56). According to the CDC, there are 186.1 million persons fully vaccinated against COVID-19 in the United States, as of October 5, 2021. (*Id.* at ¶ 32).

Unfortunately, new variants of the disease have emerged. The Delta variant is highly infectious and more contagious than previously dominant variants and has now become the predominant variant in the United States and in Allegheny County. ECF#1-1, *ACPEIU Complaint*, Ex. C, pg. 2 ("… With the delta variant on the rise, vaccination has never been mor critical…" "Highmark Health and Allegheny Health Network fully support the County's efforts to further safeguard county employees and our community at large as the COVID-19 pandemic continues to evolve, and particularly as the impact of the Delta variant grows across the country."); *Id.* ¶ 142

---

[1] The FACTS are from the complaints filed in this case and exhibits attached to the MOTION TO DISMISS.
[2] This is a consolidated lawsuit asserting nearly identical allegations in two Complaints. For ease of reference, when citations are made to a Complaint, it is to the Complaint filed in the lead case filed by the ACPEIU.

1   ("Our vaccines are working exceptionally well.  They continue to work well for Delta with regard

2   to severe illness and death."); *Id.* ¶ 144 ("The vaccine was also found to be highly effective against

3   the delta variant.")

4   **B.**   **Allegheny County Policy[3]**

5        Throughout the COVID-19 pandemic, Allegheny County has enacted policies and practices

6   designed to halt the spread of COVID-19 and protect its employees.  (Ex. A to MOTION TO DISMISS.)

7   These policies and practices were informed by the best available data and public-health guidance

8   at the time the policies and practices were enacted.  *Id.*  Allegheny County first implemented

9   masking and social distancing practices.  *Id.*  In addition to continued masking and social distance

10  measures, Allegheny County then announced a new work rule on August 5, 2021, which required

11  all County employees who are unvaccinated against COVID-19 to wear face masks and undergo

12  weekly testing for COVID-19. *Id.; (See e.g.*, ECF #1-1, ¶ 18).  Most recently, on September 29, 2021,

13  Allegheny County announced that it was implementing a COVID-19 vaccine mandate for all

14  County employees, citing to a "rapid rise in cases and hospitalizations in our area" due to the Delta

15  variant. (*See e.g.*, ECF 1-1, ¶ 26).

16       Pursuant to the policy, "all Allegheny County employees under the Executive branch must

17  have received their second dose of a two-dose COVID-19 vaccine or a one-dose vaccine" on or

18  before December 1, 2021. (Ex. A to MOTION TO DISMISS; *e.g.*, ECF 1-1, *ACPEIU Complaint*, ¶ 33).

19  The policy allows for exceptions "as required by law" and indicates that "employees who fail to

20  submit proof of completed vaccination by December 1, 2021 (without an approved accommodation)

21  will be subject to termination of employment."  (Ex. A to MOTION TO DISMISS).

22  **C.**   **Pending State Action before the Pennsylvania Labor Relations Board**

23       The Plaintiff Unions are two distinct collective bargaining units composed of County

24  employees – the Allegheny County Prison Employees Independent Union ("ACPEIU") and the

25  _____

26  [3] The Plaintiff Unions refer to Allegheny County's vaccine policy throughout their Complaints.  However, they do not

27  attach it.  Allegheny County has corrected this omission in its Exhibit "A" to its MOTION TO DISMISS.  This court may
    consider, "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the
    plaintiff's claims are based on the document."  *Pension Ben. Guar. Corp. v. White Consol. Industries, Inc.*, 998 F.2d

28  1192, 1196 (3d Cir. 1993).

Allegheny County Police Association ("ACPA").   These unions are established pursuant to distinct statutory authority, although the statutes are largely indistinguishable:

1. The ACPEIU is organized pursuant to statutory authority granted in the Public Employee Relations Act (43 P.S. § 1101.101 *et seq.*) – also known as Act 195 (Public Employe Relations Act ("PERA")); and
2. The ACPA is organized pursuant to the Policemen and Firemen Collective Bargaining Act (43 P.S. § 217.1 *et seq.*) – also known as Act 111.

Allegheny County is a political subdivision of the Commonwealth of Pennsylvania and the public employer of the ACPEIU's and the ACPA's members.   Both the ACPEIU and the ACPA operate under a Collective Bargaining Agreement ("CBA") with Allegheny County.   (*See e.g.*, ECF #1-1, *ACPEIU Complaint*, ¶ 8).

On or about August 19, 2021, the ACPEIU filed a Charge of Unfair Practices under the PERA with the Pennsylvania Labor Relations Board ("PLRB") regarding the requirement that County employees who are unvaccinated against COVID-19 wear face masks and undergo weekly testing for COVID-19 via nasal swab, which was announced on August 5, 2021.   (ECF #1-1, ¶¶ 18, 20).   The ACPA filed a similar charge under the PLRA. (ECF #1-1, Allegheny County Police at CV. No. 21-1538, *ACPA Complaint*, ¶16.)

Both Unions contend that the unilateral imposition of the County's work rule constitutes an unfair practice in violation of PLRB rules. The day after Allegheny County announced its vaccine mandate, on or about September 30, 2021, the Unions amended their charges of unfair practices before the PLRB to include the claim that Allegheny County's vaccine mandate is a mandatory subject of collective bargaining.

**D.**   **Consolidated Lawsuit**

The ACPEIU and ACPA filed companion lawsuits that have been removed to this court at dockets 2:21-cv-1537 and 2:21-cv-1538 respectively.   The Unions lawsuits have been consolidated at 2:21-cv-1537.   The Unions make four arguments in their Complaints.   First, they argue that COVID-19 has a low mortality rate and that the disease does not present a significant risk of death to individuals employed at the Jail or the Police Department, as the number of deaths and hospitalizations of employees or inmates is minimal. (*See e.g.*, ECF 1-1, ¶¶ 30, 186-195).   Second,

the Unions assert that medical products under emergency use authorization must be subject to informed consent or refusal and thus, cannot be mandated.  (*See e.g.*, ECF 1-1, ¶¶ 78-94).  Third, the Unions contend that the COVID-19 vaccines are risky due to potential adverse side effects. (*See e.g.*, ECF 1-1, ¶¶ 96-139).  Finally, the Unions argue that the vaccines lack immunizing effect, meaning that COVID-19 can spread even among those vaccinated against the disease.  (*See e.g.*, ECF 1-1, ¶¶ 141-157).

The Complaints are each two counts; seeking a preliminary injunction (Count I) and a permanent injunction (Count II).  The Complaints assert federal Constitutional Claims of 9th Amendment and 14th Amendment (procedural due process; substantive due process; and equal protection); and a statutory claim under the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 360bbb-3.  It is unclear if the Complaints assert any state-based claims.  There are no Pennsylvania statutory claims asserted and no state claims raised other than the claims that are already pending before the PLRB. (*See e.g.*, ECF 1-1.)  Allegheny County has filed a MOTION TO DISMISS.  This BRIEF is submitted in support of that MOTION.

## STANDARD OF REVIEW

The standard of review for a FED.R.CIV.P. 12(b)(6) motion to dismiss, this court must consider, "the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *Pension Ben. Guar. Corp. v. White Consol. Industries, Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).  This court is also to, "consider the complaint in its entirety, as well as… documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009).  Further, this court may consider, "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Ben. Guar. Corp. v. White Consol. Industries, Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

<u>ARGUMENT</u>

## I.    Federal Claims

Federal law requires that in order to hold a municipal government liable for a constitutional violation, more is required than just pleading a constitutional violation. *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 692 (1978). *Monell* requires that the plaintiff (using 42 U.S.C. § 1983) plead 1) a constitutional violation, 2) a policy or custom of the municipality, and 3) a causal connection between the two. *Berg v. County of Allegheny*, 219 F.3d 261, 275 (3d Cir. 2000) (a § 1983 plaintiff, "must demonstrate that the violation of his rights was caused by either a *policy* or a *custom* of the municipality."). The Unions have failed to raise § 1983 claims but note that Allegheny County does have a vaccination policy which is described in the Complaints and attached to the MOTION TO DISMISS.

### A.    No Cause of Action Under 9th Amendment

The Unions assert in a conclusory fashion, that Allegheny County deprived their members of their Ninth Amendment right. *See* ECF #1-1, *ACPEIU Complaint*, ¶¶ 162, 167, 210, and 214. The Ninth Amendment provides: "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." U.S. Const. amend. IX. The Ninth Amendment is a rule of construction, clarifying that an enumerated Bill of Rights does not imply federal authority in unenumerated areas, and by itself does not confer substantive rights for purposes of § 1983. *Soder v. Chenot,* No. 06–1522, 2007 WL 4556670, at *4 (M.D. Pa. Dec. 20, 2007). The law of this Circuit is that the Ninth Amendment, taken alone, "does not independently provide a source of constitutional rights." *Perry v. Lackawanna County Children & Youth Services,* 345 Fed. Appx. 723, 726 (3d Cir. 2009) citing *Jenkins v. C.I.R.,* 483 F.3d 90, 92 (2d Cir. 2007); *Schowengerdt v. United States,* 944 F.2d 483, 490 (9th Cir. 1991); and *Willson v. Yerke,* No. 3:10CV1376, 2011 WL 332487,*4 (M.D. Pa. Jan. 31, 2011) (dismissing Ninth Amendment claim on 12(b)(6) grounds because it does not provide an independent basis for asserting a civil rights claim); *Nicolette v. Caruso,* 315 F.Supp.2d 710, 718 (W.D.Pa. 2003) (same.) As such, the Unions do not have a viable Ninth Amendment Claim. It must be dismissed.

**B.**   **No Cause of Action under 14th Amendment Equal Protection**

The Unions' Complaints assert - barely and in only one location - that their members' 14th Amendment Equal Protection Rights have been violated by Allegheny County's vaccination policy.  *See e.g.* ECF #1-1, *ACPEIU Complaint*, ¶ 208.  To the extent that this is enough to present a claim, the 14th Amendment's Equal-Protection Clause commands that, "no State shall ... deny to any person within its jurisdiction the equal protection of laws." U.S. Const. amend. XIV, § 1. Equal protection does not mean all forms of differential treatment are forbidden. *Nordlinger v. Hahn*, 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992) ("Of course, most laws differentiate in some fashion between classes of persons. The Equal Protection Clause does not forbid classifications."). Instead, equal protection "simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Id.*

The Equal Protection Clause, "is essentially a direction that all person similarly situated should be treated alike." *City of Cleburne, Tex. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed. 2d 313 (1985). To maintain an Equal Protection claim where, as here, no suspect classification is in play (*i.e.* race, sex, religion, national origin), "a plaintiff must allege that (1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment." *Hill v. Bor. of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006) (discussing *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).

The Unions have not plead how they have been treated differently from other *similarly situated* people.  The vaccine mandate at issue applies equally to all Executive Employees (unless seeking medical/religious accommodation).   The Unions' Equal Protection argument fails as a matter of law.

**C.**   **No Cause of Action under 14th Amendment Procedural Due Process**

Allegheny County notes that the Unions' Complaints assert that Allegheny County has violated their procedural due process rights.  *See e.g.* ECF #1-1, *ACPEIU Complaint*, ¶¶ 208, 226 – 235.  However, despite use of the words "procedural due process," nothing in the Complaints sets

forth any right of "process" that was allegedly violated by Allegheny County.  To the extent this Honorable Court finds that there is a colorable claim of procedural due process asserted, to survive a motion to dismiss, the Unions are required to had pled facts supporting allegations that they were "(1) deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures available to [them] did not provide 'due process of law.' " *Hill v. Bor. of Kutztown*, 455 F.3d 233-234 (3d Cir. 2006) (quoting) *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000)). A due process violation "is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process." *Zinermon v. Burch*, 494 U.S. 113, 126, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). If there is a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what he wants.  *McDaniels v. Flick*, 59 F.3d 446, 460 (3d Cir. 1995).  The Third Circuit has held that a plaintiff may not maintain a federal due process lawsuit when he or she could have taken advantage of an adequate state post deprivation remedy but did not. *Elsmere Park Club, L.P. v. Town of Elsmere*, 542 F.3d 412, 420 (3d Cir. 2008).  Consistent with this precedent, the Unions have not plead a viable 14th Amendment procedural due process claim.  The due process claim should be dismissed.

**D.**   **No Cause of Action under 14th Amendment Substantive Due Process**

The 14th Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law...." U.S. Const. amend. XIV. "Substantive due process is a 'component of the [14th Amendment] that protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them.' " *Wrench Transp. Sys., Inc. v. Bradley*, 340 F. App'x 812, 815 (3d Cir. 2009) (internal quotations omitted) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)). "Substantive due process refers to and protects federal rights." *Ransom v. Marazzo*, 848 F.2d 398, 411 (3d Cir. 1988). That being so, the analysis of any substantive due process claim "must begin with a careful description of the asserted right[.]" *Reno v. Flores*, 507 U.S. 292, 302 (1993). To be protected, the "asserted right" must be "fundamental" - arising from the Constitution itself, and not

from state law. *Id.* Here, the Unions appear to be basing their substantive due process claim on the right of their members to refuse medical care/bodily integrity, and the right to work for a living and pursue their chosen profession.

### 1. Public Employment is not a Fundamental Right

To prevail on a substantive due process claim challenging a state actor's conduct, "a plaintiff must establish as a threshold matter that he has a protected property interest to which the Fourteenth Amendment's due process protection applies." *Nicholas v. Pennsylvania State Univ.*, 227 F.3d 133, 139–140 (3d Cir. 2000) (*quotation marks and citation omitted*). Whether a property interest is protected for purposes of substantive due process is a question that is not answered by reference to state law. Rather, for a property interest to be protected for purposes of substantive due process, it must be "fundamental" under the United States Constitution. *Id.* at 140. This court has held explicitly that public employment is not a fundamental right entitled to substantive due process protection. *Id.* at 142–143. Any substantive due process claim premised on the union members' right to employment with Allegheny County must be dismissed.

Furthermore, case law strongly suggests that substantive due process only extends to situations in which there is some degree of permanence to the loss of liberty or property. *Paradise Concepts, Inc. v. Wolf*, 2020 WL 5121345 at *4 (E.D. Pa. Aug. 31, 2020) citing *Six v. Newsom*, 462 F. Supp. 3d 1060, ——, No. 20-877, 2020 WL 2896543, at *7 (C.D. Cal. May 22, 2020) (holding that the right to earn a living "protects against 'a complete prohibition of the right to engage in a calling' and not against brief interruptions to that pursuit" (quoting *Conn v. Gabbert*, 526 U.S. 286, 292, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999). *See also Cole v. Encapera*, 758 Fed.Appx. 252, 255–56 (3d Cir. 2018) (rejecting due process claim on qualified immunity grounds because right to pursue occupation free from brief interruption caused by government action was not clearly established). Here, union members have the choice to receive a vaccination in compliance with the policy, or they are free to work elsewhere. There is no complete prohibition against employment.

Moreover, a Third Circuit panel in an unpublished opinion explicitly rejected the argument that there is any fundamental right to earn a living. *Wrench Transp. Sys., Inc. v. Bradley*, 340 F.

App'x. 812, 815 (3d Cir. 2009) ("[T]he right to 'engage in business'" is "more similar to the type of intangible employment rights that this Court has rejected as not protected by substantive due process than the real property interests which can be protected by substantive due process").  More recent decisions by and within the Third Circuit have cited to this holding approvingly. See, e.g., Joey's Auto Repair & Body Shop v. Fayette Cnty., 785 F. App'x 46, 50 (3d Cir. 2019) (noting that "a substantive due process right to conduct business without zoning interference extends beyond our precedent"); Saucon Valley Manor, Inc. v. Miller, 392 F. Supp. 3d 554, 571-72 (E.D. Pa. 2019) (holding that "neither the right to operate a business nor the property interest in a business license are 'fundamental' rights or property interests protected by substantive due process"). For these reasons, Plaintiffs' substantive due process claims based on a right to employment must be dismissed.

### 2.  Rational Basis Standard Met as Applied to Mandatory Vaccination Measures

The Due Process Clause of the 14th Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The right to bodily integrity is protected by the substantive component of the Due Process Clause. Phillips v. Cty. of Allegheny, 515 F.3d 224, 235 (3d Cir. 2008) ("Individuals have a constitutional liberty interest in personal bodily integrity that is protected by the Due Process Clause of the Fourteenth Amendment.")  However, a person's right to bodily integrity is a generalized right, not a particularized one. Spady v. Bethlehem Area Sch. Dist., 800 F.3d at 638 (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001))

Here, the Union Plaintiffs claim a right to refuse medical care in choosing to remain unvaccinated against COVID-19 while still serving the public in the workplace.  Where an alleged government deprivation infringes on a fundamental right, courts apply strict scrutiny, the most rigorous form of constitutional scrutiny of government action.  Washington v. Glucksberg, 521 U.S. 702, 721 (1997). However, where the infringed liberties are neither fundamental nor based on suspect classification, rational basis review applies.  Glucksberg, 521 U.S. at 728. Under rational basis review, "legislation is presumed to be valid and will be sustained if the classification drawn by the

statute is rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Ctr.,* *473 U.S. 432, 440 (1985).*

Strict scrutiny is not applicable here. First, union members have a choice as to whether to receive the vaccine (and which available vaccine) or seek employment elsewhere. They are not being forced to receive the vaccine without their consent. Allegheny County's policy objectively does not infringe on any right to bodily integrity to refuse medical care. Furthermore, federal courts have consistently held that vaccine mandates do not implicate a fundamental right and that rational basis review therefore applies in determining the constitutionality of such mandates. *Klaassen v. Trustees of Indiana Univ. ("Klaassen II"), 7 F.4th 592 (7th Cir. 2021)* (rejecting assertion by plaintiffs, who challenged Indiana University's mandatory COVID-19 vaccine requirement, that the rational basis standard does not offer enough protection for their interests, indicating that the court "must apply the law established by the Supreme Court" in *Jacobson v. Massachusetts, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643 (1905),* which, in holding that "a state may require all members of the public to be vaccinated against smallpox," "shows that plaintiffs lack" a fundamental right to be free from mandatory vaccine measures); *Klaassen v. Trustees of Indiana University, --- F.Supp.3d---- , 2021 WL 3073926, *24 (N.D. Ind. July 18, 2021)* (collecting cases demonstrating "the consistent use of rational basis review to assess mandatory vaccination measures," and, in light of "a century's worth of rulings, declining to "extend substantive due process to recognize" a fundamental right to be free from COVID-19 vaccination requirements); *Harris v. Univ. of Mass., No. 21-cv-11244, 2021 WL 3848012, at *6 (D. Mass. Aug. 27, 2021)* ("[T]he case [challenging a policy requiring students who seek to be on campus to be vaccinated prior to fall semester] "commends a deferential standard for analyzing Fourteenth Amendment challenges to generally applicable public health measures like the one here"); *Roman Cath. Diocese of Brooklyn v. Cuomo, —— U.S. ——, 141 S. Ct. 63, 67, 208 L.Ed.2d 206 (2020)* (Gorsuch, J., concurring) (explaining that *Jacobson* is "essentially ... rational basis review").

Even in taking as true the Unions' allegations as set forth in the Complaints – which attempt to call into question the most reliable science available today on the subject of COVID-19 - the

substantive due process claim still fails as a matter of law.  Allegheny County enacted its vaccination policy in reliance on the CDC, the Pennsylvania Department of Health, and the Allegheny County Health Department determining that the "best way to slow the spread of COVID-19 and to prevent infection by the Delta variant or other variants is to be vaccinated." (Exhibit A to the MOTION TO DISMISS.)    Rational basis review is "very deferential," *Newark Cab Ass'n v. City of Newark,* 901 F.3d 146, 156 (3d Cir. 2018), and "a paradigm of judicial restraint." *F.C.C. v. Beach Commc'ns, Inc.,* 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993).  "The general rule is that legislation ... will be sustained if [it is] rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (citations omitted). "Any reasonably conceivable state of facts" will do, and there is a "strong presumption validity." *Heller v. Doe,* 509 U.S. 312, 319-20, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993).  Courts must be highly deferential because rational basis review "is not a license ... to judge the wisdom, fairness, or logic of legislative choices," *Heller,* 509 U.S. at 319, 113 S.Ct. 2637.

Courts in applying this rational basis standard to COVID-19 vaccination mandate cases have found a rational basis to exist even where plaintiffs have put forth competing scientific data. *Klaassen I,* – F. Supp. 3d —, 2021 WL 3073926, at * 38 *citing Phillips v. City of New York,* 775 F.3d 538, 542 (2d Cir. 2015) ("[P]laintiffs argue that a growing body of scientific evidence demonstrates that vaccines cause more harm to society than good, but as *Jacobson* makes clear, that is a determination for the [policymaker], not the individual objectors.").  Rational basis analysis leaves it to Allegheny County, not the Union Plaintiffs, to determine what is likely to be the most effective mode for protection of Allegheny County's employees and the public against a deadly disease. Accordingly, Plaintiffs' substantive due process claim must be dismissed with prejudice.

E.    **14th Amendment Shocks the Conscious Standard Not Met**

The Unions 14th Amendment due process claims also fail because establishing a mandatory vaccination policy (with exceptions in compliance with law) does not "shock the conscious."  The Supreme Court has "emphasized time and again that '[t]he touchstone of due process is protection of the individual against arbitrary action of government.'" *County of Sacramento v. Lewis,* 523 U.S.

833, 845 (1998) (quoting *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974)). "[O]nly the most egregious official conduct can be said to be arbitrary in the constitutional sense." *Id.* at 846. In other words, "the due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm." *Id.* at 848. With this backdrop, Supreme Court precedent holds that state action violates due process only when it "shocks the conscience." *Id.* at 846. The lawful enforcement of an employment vaccination policy to protect the health and safety of employees and the public they serve from a deadly virus does not meet the definition of conscience-shocking deprivation.

F.   **No Cause of Action Under Food, Drug, and Cosmetic Act**

The Unions assert that the Allegheny County COVID-19 vaccination policy violates Federal Food, Drug, and Cosmetic Act ("FDCA"). (ECF #1-1, *ACPEIU Complaint*, 78-94, 254-274.) The FDCA authorizes the FDA to issue an "emergency use authorization" ("EUA") for medical products, including vaccines, to be introduced into interstate commerce and administered to individuals during public health emergencies when the product has not yet undergone the standard review and approval process. 21 U.S.C. § 360bbb-3(a)(1), (2). To combat the spread of COVID-19 in the United States, the FDA granted EUAs for the Pfizer, Moderna and J&J vaccines.

The Unions' claim fails for two reasons. First, the Unions misconstrue the EUA section of the FDCA, which does not prevent an employer from requiring vaccines as a condition of employment. The plain language of 21 U.S.C. § 360bbb-3(e) demonstrates that this section only applies to medical providers administering COVID-19 vaccines and to the individuals potentially receiving the vaccine. The FDCA states that for the emergency use of an unapproved product, the Secretary of Health and Human Services shall "*for a person who carries out any activity for which the authorization is issued*, establish such conditions on an authorization under this section as the Secretary finds necessary or appropriate to protect the public health[.]" 21 U.S.C. § 360bbb-3(e)(1)(A) (emphasis added). Specifically, the FDCA requires the Secretary issue:

(i)   Appropriate conditions designed to ensure that *health care professionals administering the product are informed*—

(I)   that the Secretary has authorized the emergency use of the product;

     (II) of the significant known and potential benefits and risks of the emergency use of the product, and of the extent to which such benefits and risks are unknown; and

(III) of the alternatives to the product that are available, and of their benefits and risks.

    (ii) Appropriate conditions designed to ensure that *individuals to whom the product is administered are informed—*

     (I) that the Secretary has authorized the emergency use of the product;

     (II) of the significant known and potential benefits and risks of such use, and of the extent to which such benefits and risks are unknown; and

(III) of the option to accept or refuse administration of the product, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks.

21 U.S.C. § 360bbb-3(e)(1)(A)(i), (ii) (emphases added).

     Courts have held that the plain language of 21 U.S.C. § 360bbb-3(e) regarding informed consent indicates that this provision "only applies to medical providers" and to the individuals in the process of receiving a vaccine; it does not apply to entities mandating vaccines. *Valdez v. Grisham*, No. 21-CV-783 MV/JHR, 2021 WL 4145746, at *4 (D.N.M. Sept. 13, 2021) (quoting *Klaassen v. Trustees of Indiana Univ.*, No. 21-cv-238, – F. Supp. 3d –, –, 2021 WL 3073926, at *25 (N.D. Ind. July 18, 2021), *aff'd*, 7 F.4th 592 (7th Cir. 2021) (citing 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)); *Bridges v. Houston Methodist Hosp.*, No. CV H-21-1774, 2021 WL 2399994, at *2 (S.D. Tex. June 12, 2021) (noting that 21 U.S.C. § 360bbb-3 "does not confer a private opportunity to sue the government, employer, or worker"). Moreover, the Department of Justice issued a memorandum opinion concluding that employers are not subject to the FDCA.[4] Here, Allegheny County is not administering vaccines to its employees. Furthermore, Allegheny County is not compelling or coercing the Unions' members to get vaccinated against COVID-19. The only requirement imposed by Allegheny County on the Unions' members is that they "obtain the vaccine from a medical provider and . . . attest that they have been vaccinated, save for certain exemptions."

---

[4] Dep't of Justice, Whether Section 564 of the Food, Drug, and Cosmetic Act Prohibits Entities from Requiring the Use of a Vaccine Subject to an Emergency Use Authorization at 18 (July 6, 2021), https://www.justice.gov/olc/file/1415446/download. ("[S]ection 564 of the FDCA does not prohibit public or private entities from imposing vaccination requirements, even when the only vaccines available are those authorized under EUAs.")

*Klaassen*, 2021 WL 3073926, at *25. Therefore, the Unions' claim fails as a matter of law because Allegheny County as an employer is not subject the FDCA.

Second, because one of the three vaccines has received full FDA approval, the Unions' claim is moot. The Unions contend that Allegheny County's vaccine mandate coerces or "unduly pressures" their members to receive vaccines that the FDA has authorized only for emergency use. However, on August 23, 2021, the FDA granted the Pfizer vaccine full approval for individuals 16 years of age and older.[5] The licensed vaccine is now marketed as Comirnaty.[6] The Pfizer and Comirnaty fact sheet attached to the Unions' Complaints advises vaccine recipients that the FDA-*approved* Comirnaty vaccine and the FDA-*authorized* Pfizer vaccine under EUA "have the same formulation and can be used interchangeably to provide the COVID-19 vaccination series." (ECF #1-1, *ACPEIU Complaint*, Ex. C-6, pg. 53.) The Unions' assertion that the two vaccines are different is wrong. The FDA clearly indicates that the Pfizer vaccine has been branded and is now marketed as Comirnaty.[7] Therefore, the Unions' claims regarding emergency use authorization are moot for anyone over the age of 16. For these reasons, the Unions' claim fails as a matter of law.

## II.   State/Collective Bargaining Agreement Claims

### A.   To Extent A State Claim is Asserted Court Must Abstain from Addressing it

To the extent that the Complaints can be interpreted as raising a state claim, it can only be that Allegheny County allegedly imposed its vaccination policy in violation of the Unions' collective bargaining rights. *See e.g.* ECF #1-1, *ACPEIU Complaint*, ¶¶ 8, 21, 244, 283, 291, 293, 295-299. The Unions concede that they have already filed unfair labor practice complaints before the PLRB raising exactly this claim. *Id.*, 20.

This Court should abstain from hearing the Union Plaintiffs' state claims under the abstention doctrine enunciated in *Railroad Commission v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941) ("Pullman abstention"). The issue of whether Allegheny County's COVID-19

---

[5] *FDA News Release*, (August 23, 2021), https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/comirnaty-and-pfizer-biontech-covid-19-vaccine.
[6] *Id.*
[7] *Id.*

vaccination requirement is a mandatory subject of bargaining is an unresolved state-law issue that underlies the entirety of the Union Plaintiffs' claims.

> <u>Pullman</u> abstention is proper where three threshold criteria are met:
>
> First, there must be uncertain issues of state law underlying the federal constitutional claims brought in the federal court. Second, these state law issues must be amenable to an interpretation by the state courts that would obviate the need for or substantially narrow the scope of the adjudication of the constitutional claims. And third, it must appear that an erroneous decision of state law by the federal court would be disruptive of important state policies.

*D'Iorio v. County of Delaware*, 592 F.2d 681, 686 (3d Cir. 1978), *overruled on other grounds sub nom.*, *Kershner v. Mazurkiewicz*, 670 F.2d 440, 448 (3d Cir. 1982).

The first prong of the <u>Pullman</u> abstention analysis should be resolved in Allegheny County's favor, because the issues of whether Allegheny County's vaccination requirement is a mandatory subject of bargaining falls squarely under the Pennsylvania Employees Relations Act ("PERA"), 43 P.S. § 1101.101 *et seq.*; 43 P.S. §§ 1101.701 ("Matters subject to bargaining") – 1101.702 ("Matters not subject to bargaining"); *see also Ass'n of Pennsylvania State Coll. & Univ. Facs. v. Pennsylvania Lab. Rels. Bd.*, 226 A.3d 1229, 1241 (Pa. 2020) (holding that "certain topics under PERA are considered to be mandatory subjects of bargaining, others are considered to be permissive or voluntary subjects of bargaining, and, finally, certain matters are not permitted to be bargained at all, as they are deemed to be illegal subjects of bargaining.").

The issue of whether Allegheny County's vaccination requirement must be bargained before enforcement is at the crux of the Unions' Complaints. In fact, the Unions all but acknowledge[8] their Complaints were filed merely because the PLRB is not statutorily authorized to issue an injunction before resolution of a charge of unfair labor practices. 43 P.S. § 1101.1501 (providing a means for the PLRB to obtain post-order injunctive relief to enjoin an unfair labor practice).[9]

---

[8] *See e.g.* ECF #1-1, *ACPEIU Complaint*, ¶¶ 244, 283, 296 – 299.
[9] Section 1101.1501 of PERA provides that the PLRB is authorized to go to court on a union's behalf and obtain temporary relief if it finds it appropriate. Thus, the PLRB provides a remedy for the Union Plaintiffs, just not on timeline that the Union Plaintiffs seek.

Moreover, Pennsylvania state and federal courts recognize that the PLRB has exclusive jurisdiction where a party seeks redress of conduct which arguably constitutes an unfair labor practice. *Plouffe v. Gambone*, CA 11-6390, 2012 WL 2343381, at \*7 , (E.D. Pa., June 20, 2012), *aff'd sub nom. Plouffe v. Cevallos*, 777 F. App'x 594 (3d Cir. 2019).

> The Pennsylvania Supreme Court has held that if a party seeks redress of conduct which arguably constitutes one of the unfair labor practices under PERA, jurisdiction to determine whether an unfair labor practice has occurred lies in the PLRB, and nowhere else. Indeed, PERA states that the PLRB's power to prevent unfair practices "shall be exclusive." 43 Pa. Cons.Stat. § 1101.1301. Thus, courts in this district have dismissed claims for unfair labor practices under PERA in deference to the PLRB's exclusive jurisdiction.

*Id.* The fact that the central issue relative to the Unions' Complaints is a matter of state-law that is *exclusively reserved* for the PLRB strengthens the argument for <u>Pullman</u> abstention—this is not only an issue of state law but also one which must be heard in a particular forum.

The second prong of the <u>Pullman</u> abstention analysis should also be resolved in Allegheny County's favor because to the extent that the PLRB finds that Allegheny County's vaccination requirement to be a mandatory subject of bargaining in whole or in part, the need for this Court's constitutional review could be eliminated or sharply narrowed. For example, if the PLRB decides entirely in the Unions' favor and orders bargaining on this issue, then there would be no constitutional claim to resolve because Plaintiffs would be at least temporarily excused from the vaccination requirement pending negotiations. Further, in that example, any negotiated requirement would no longer be subject to challenge by the Unions. Thus, resolution of the Union Plaintiffs' constitutional claims is premature and unnecessary at this juncture and abstaining from the undertaking of that analysis is proper under <u>Pullman</u>.

Relatedly, any decision by this Court that goes to the Union Plaintiffs' bargaining rights under PERA would be disruptive of important state policies.

**B.**   **Public Health, Safety, and Welfare Trump Collective Bargaining**

Both Act 195 and Act 111 are founded upon the principle that collective bargaining rights of public employees are subject to a greater public interest – the health, safety and welfare of the public. With respect to Act 195 (PERA) the Commonwealth of Pennsylvania has codified a public

employee's right to organize and collectively bargain with their public employers, but specifically limited such rights to the paramount public interests which bind every public employer:

> The General Assembly of the Commonwealth of Pennsylvania declares that it is the public policy of this Commonwealth and the purpose of this act to promote orderly and constructive relationships between all public employers and their employes **subject, however, to the paramount right of the citizens of this Commonwealth to keep inviolate the guarantees for their health, safety and welfare**.

43 P.S. § 1101.101 (emphasis added).

Although not explicitly incorporated in the statute, Courts have acknowledged that Act 111 must be interpreted similarly.   "[T]here are certain matters which strike at the heart of policy decisions that directly implicate the public welfare, and, thus, should be insulated from the give-and-take of collective bargaining". *Borough of Ellwood City v. Pennsylvania Labor Relations Bd.,* 606 Pa. 356, 374, 998 A.2d 589, 599–600 (2010).  Given the nature of the current issue – a vaccine mandate imposed in an effort to slow the spread of a worldwide pandemic and it's mutations – the health, safety and welfare of the citizenry of Pennsylvania precludes the application of the collective bargaining process to the implementation of COVID vaccine mandates.

The critical element, that the health, safety and/or welfare of the public is at stake is incontrovertible.  Since the start of vaccine mandate litigation, courts have consistently upheld COVID vaccine mandates and concluded that the public good supports such actions.  *E.g.* "[G]iven the severity and number of cases and deaths during the COVID-19 pandemic so far, **there is a real and substantial relation between [a vaccine mandate] and the need to protect public health**.  Last, as the *Jacobson* Court noted then, other states and countries in Europe have likewise enacted similar vaccine policies giving more legitimacy to the Policy at issue."  *Children's Health Def., Inc. v. Rutgers State Univ. of New Jersey,* CV2115333ZNQTJB, 2021 WL 4398743, at *5 (D.N.J. Sept. 27, 2021).  *See also* Harris v. Univ. of Massachusetts, Lowell, 21-CV-11244-DJC, 2021 WL 3848012, at *6 (D. Mass. Aug. 27, 2021) (emphasis added) ("Defendants' affidavits attest that the Vaccine Policy was supported by, among other things, CDC guidance and research that the vaccines were safe and effective at reducing the incidence and severity of COVID-19 since '**preventing the spread of COVID-19 was a critical public health goal** for each campus, particularly in light of

the congregate setting of each campus'."); *Matter of City of Newark*, A-0146-21, 2021 WL 4398457, at *6 (N.J. Super. Ct. App. Div. Sept. 27, 2021)* (emphasis added) ("**the clear national and state public policy to combat the health threats posed by COVID-19, supports the City's authority to implement a vaccination mandate**. In that regard, [the New Jersey] Supreme Court has recognized that the COVID-19 pandemic is an extraordinary situation justifying extraordinary responses.").

On October 19, 2021, the Supreme Court declined to consider an emergency appeal of a mandatory vaccination policy adopted in Maine. *Does 1-3 v. Mills*, No. 21A90, 2021 WL 5027177, at *1 (US Oct. 29, 2021).* Maine had adopted the policy citing law allowing "temporary rules on an emergency basis without going through regular notice and comment procedures 'to avoid an immediate threat to public health, safety or general welfare'. *Does 1-6 v. Mills*, 21-1826, 2021 WL 4860328, at *3 (1st Cir. Oct. 19, 2021)*. The Supreme Court's action leaves in place a precedential decision of the First Circuit Court of Appeals denying an injunction in an action that sought to challenge Maine's regulation that all licensed healthcare workers be vaccinated against COVID-19. That opinion recognizes the severity of the COVID-19 pandemic, the importance of governmental action to protect public and employee health safety and welfare. *Id. See also Does 1-6 v. Mills*, 21-242, 2021 WL 4783626, *2 (U.S.D.C. D Maine, Oct. 13, 2021)*.

The responses of the courts establish the existence of and an immediate need to address the public concerns brought about by the COVID-19 pandemic. The fundamental interests of all citizens of this Commonwealth in their health, safety and welfare must not be negated by the preferences of the few.

**C.    Pennsylvania Law Grants Allegheny County Authority for Vaccination Policy**

Further reinforcement of Allegheny County's managerial rights relating to disease prevention or control is statutorily established within the Disease Prevention and Control Law of 1955 (35 P.S. § 521.1 *et seq.*)("DPCL"). Pursuant to this statute a municipality is granted authority to enact regulations and rules relating to disease prevention and control:

> (c) Municipalities which have boards or departments of health or county departments of health may enact ordinances or issue rules and regulations relating to disease

prevention and control, which are not less strict than the provisions of this act or the rules and regulations issued thereunder by the board.

35 P.S. § 521.16(c).  The Pennsylvania Supreme Court has ruled that Allegheny County maintains a Department of Health and falls within the definition of those entities defined within the DPCL, i.e.: "The DPCL defines a '[l]ocal board or department of health' as '[t]he board of health or the department of public health of a city, borough, incorporated town or township of the first class, *or a county department of health*, or joint county department of health.' 35 P.S. § 521.2; Pennsylvania Rest. & Lodging Ass'n v. City of Pittsburgh, 653 Pa. 596, 624, 211 A.3d 810, 827 (2019).

Pursuant to the DPCL, Allegheny County, through use of its Health Department, is charged with the following pertinent duties:

(a) … may issue rules and regulations with regard to the following:
> …
(6) the immunization and vaccination of persons and animals;
> …
(12) any other matters it may deem advisable for the prevention and control of disease and for carrying out the provisions and purposes of this act.

35 P.S. § 521.16.  It is under this same authority that mandatory vaccination of school age children is created.  24 P.S. § 13-1303a.  The grant of such authority to Allegheny County in furtherance of the primary interest to which every public employer is bound – the health, safety and welfare of the citizens - renders the issue of the prevention and control of disease via vaccination an inherent managerial prerogative.

Courts have acknowledged statutorily created managerial prerogatives.

> Reading section 607(e) of Act 205 in *pari materia* with section 702 of the PERA, we conclude that the city's decision to avail itself of the assistance offered by Act 205 is an inherently managerial decision. If it were not, section 607(e), requiring the establishment of a revised benefit plan, presumably would require negotiations so as not to be in conflict with the PERA. By allowing the city to establish a revised plan without mandating labor negotiations, the legislature has, in effect, brought this activity within the ambit of section 702 (inherent managerial activity).

*City of Pittsburgh v. Com., Pennsylvania Labor Relations Bd.*, 539 Pa. 535, 541, 653 A.2d 1210, 1213–14 (1995). *See also  Borough of Morrisville v. Morrisville Borough Police Benevolent Ass'n*, 756

A.2d 709, 711 (Pa.Commw. Ct. 2000) ("In fact, because the Board allocates excess pension interest *only* "at the direction of [the] municipalities" or "as each municipality deems appropriate," we conclude that the Law has made the allocation of excess pension interest an inherent managerial prerogative of the municipalities."). The authority granted to Allegheny County for its vaccination policy renders this a managerial prerogative as a matter of law.

**D.** **A vaccine mandate is a managerial prerogative enforceable without bargaining.**

Assuming the statutory interests cited do not suffice to establish Allegheny County's authority to require vaccines, a public employee's right to collectively bargain is further limited to those issues that are not managerial prerogatives. Act 195 (PERA) specifically excludes these types of policy decisions from the bargaining process:

> Public employers shall not be required to bargain over matters of inherent managerial policy, which shall include but shall not be limited to such areas of discretion or policy as the functions and programs of the public employer, standards of services, its overall budget, utilization of technology, the organizational structure and selection and direction of personnel. Public employers, however, shall be required to meet and discuss on policy matters affecting wages, hours and terms and conditions of employment as well as the impact thereon upon request by public employee representatives.

43 P.S. § 1101.702. Similarly, police and firefighters subject to Act 111 have no right to bargain over matters of managerial prerogative:

> Based upon these bedrock notions of governmental responsibilities concerning the public, similar labor statutes, and prior precedent, we have no hesitation in recognizing that, although Act 111 does not speak to limitations on collective bargaining over subjects which implicate managerial prerogatives, matters which involve inherent managerial prerogatives are not subject to mandatory collective bargaining.

*Borough of Ellwood City*, 606 Pa. at 375, 998 A.2d at 600 (2010). *See also City of Allentown v. Int'l Ass'n of Fire Fighters Local 302*, 638 Pa. 584, 157 A.3d 899 (2017). At this juncture a bifurcation of the analysis is required, given a distinction between the proofs necessary for Act 195 and Act 111.

### 1. Balancing test establishes vaccines are Act 195 managerial prerogatives.

For purposes of Act 195, the Pennsylvania Supreme Court has imposed a balancing test to determine whether an employer's action falls within the scope of managerial prerogative:

> Thus, in determining whether a topic is subject to collective bargaining, the Board in the first instance, and then the courts, must consider the relative weight of the impacted interest of the public employee in wages, hours, and conditions of employment against the public employer's impacted interest in basic policy matters concerning the employer's operations, and then assess which interest predominates. If the impact on the employees' interest in wages, hours, and conditions of employment outweighs the employer's concerns about restrictions on its basic policy choices, the proposal is considered a mandatory subject of bargaining. If, however, the latter outweighs the former, such topic shall be deemed to constitute an inherent managerial prerogative and be insulated from the give-and-take of mandatory collective bargaining.

*Ass'n of Pennsylvania State Coll. & Univ. Faculties v. Pennsylvania Labor Relations Bd.*, 226 A.3d 1229, 1243-1244 (Pa. 2020)("State College").

Applying this test as did the Court in State College, it is difficult to dispute that the employees' interests are impacted. An employee who fails to obtain the vaccine can be disciplined and if an employee continues to refuse the vaccine the employee will be discharged. In State College, this was deemed to implicate employee interests in their terms and conditions of employment.

Passing then to the issue of impact upon Allegheny County's policy interest, the overwhelming evidence establishes the critical importance of the vaccination policy adopted by the County. As discussed *supra*, as to Act 195 (PERA) the Pennsylvania legislature has codified the limitations upon a public employee's right to organize and collectively bargain with their public employers, specifically directing that the rights granted are subject to "to the paramount right of the citizens of this Commonwealth to keep inviolate the guarantees for their health, safety and welfare." 43 P.S. § 1101.101. These interests constitute the core interests of every government employer.

In State College, the issue was a Child Protection Policy which required "all State System employees to submit to criminal background clearances and to report to their employing universities whenever they are arrested for, or convicted of, certain serious criminal offenses, or found or indicated to be a perpetrator of child abuse." *State College*, 226 A.3d at 1233. The Court opined:

> Manifestly, the Policy serves the State System's vital interest in protecting the safety of minors on university campuses by informing the university administration about the existence of, *inter alia*, felony child sex offenders, and generally whether employees have had interactions with the criminal justice system – information

necessary for the proper functioning of each university. Indeed, requiring the disclosure of criminal background, arrest, conviction, and child abuse information is foundationally related to not only the protection of minors, but to all students. Furthermore, and more broadly, we find that the Policy impacts the integrity of the State System's workforce and the public's respect for the State System. Moreover, we view the Policy's requirements as akin to those functions − such as programming, standards of service, and the direction of personnel − which indisputably lie at the core of management control, impacting foundational policy matters. Accordingly, we have no hesitation in concluding that the Policy, and its requirements for disclosing criminal history information and child abuse findings, implicates basic policy matters concerning the public employer's operations.

*Id.*, 226 A.3d at 1245. The County's policy is indistinguishable except that it is of a significantly larger scope. Every citizen who comes into contact with a COVID-19 positive corrections officer will be subject to possible transmission. These contacts can range from civil interactions with inmates in the enclosed pods and/or cells within the facility to close physical contacts with inmates refusing to abide by rules and regulations in a prison setting. Every hour of the day new inmates are processed through the intake portion of the prison, introducing additional inmates of unknown COVID-19 status into the facility. Every day other inmates are released from the prison and will likely return to families and acquaintances outside the prison of unknown vaccination status. The health, safety and welfare of the inmates and the public, as well as the corrections officers themselves is at issue. The interests extend to the general public health as well as the operation of the prison facility.

Having established competing core interests, the competing interest must be weighed. In State College, the Court concluded:

> Again, we view the safety of children to be a vital part of the State System's core mission of providing instruction and education. Mindful that the paramount concern in this inquiry is the public interest, *State College*, 337 A.2d at 268, we hold that the impact of the Policy on faculty members' terms and conditions of employment does not outweigh the State System's interest in its foundational policy of protecting minors who are on campus and providing a safe educational environment. Accordingly, we conclude that the Policy constitutes an inherent managerial policy over which the State System is not required to bargain. 43 P.S. § 1101.702.

*Id.* Identical reasoning requires the same result in this case. The public interest is not limited to children, but to each and every inmate and those members of the public with which they have

contact.  Those inmates often do not have access to health services others might have to diagnose and treat COVID-19.  Each case has the potential as a super spreader event in the close confines of a prison setting.  It is in the interest of safety for all that Allegheny County's vaccine policy has been enacted.  As in <u>State College</u>, this constitutes an inherent managerial policy over which the County need not bargain.

It is further noted that public safety has consistently served as a basis for such determinations of Act 195 managerial prerogatives in the past.  Although the application of these standards in pandemics has not occurred[10], the courts have addressed situations involving medically necessary limitations to bargaining authority of Act 195 units.  In *S.E. Pennsylvania Transp. Auth. v. Transp. Workers' Union of Am., AFL-CIO,* 105 Pa.Cmwlth. 436, 525 A.2d 1 (1987)("SEPTA"), the Pennsylvania Commonwealth Court addressed SEPTA's application of a policy requiring the removal of any drivers diagnosed with ischemic heart disease from their position.  An employee diagnosed with that condition was not permitted to drive and filed a grievance.  After an arbitrator ordered the grievant returned to a driving position SEPTA appealed and the dispute reached the Pennsylvania Supreme Court.  The Pennsylvania Supreme Court defined the issue to be addressed:

> At issue is whether SEPTA's promulgation of medical standards for the disqualification of transit vehicle operators is an inherent prerogative of the public employer removed from the scope of collective bargaining in both substance and application.

*Id.* at 2.  Upon consideration of the evidence the Court held:

> As SEPTA is similarly entrusted, by virtue of its enabling legislation, with the promotion of public safety and welfare, we hold that the arbitrator's award invalidating [grievant's] medical disqualification would likewise violate that public policy. Moreover, we believe SEPTA was empowered by Section 702 of PERA, as an exercise of managerial prerogative, to promulgate medical standards presumptively and permanently disqualifying persons suffering from ischemic heart disease from operator positions.

*Id.* at 4.  The parallels between <u>SEPTA</u> and this case are striking.  The County is also bound to ensure the paramount interest of public health, safety and welfare above the all.  The County is not

---

[10] The last pandemic of COVID-19's scale was the Spanish Flu in 1918-1919.  This was well before the enactment of both Act 195 and Act 111.

only empowered by Section 702 of PERA, but under the DPCL to enact ordinances or issue rules and regulations relating to disease prevention and control.  These public policy mandates require a similar outcome.

A second case produced a similar result applying this same factual scenario.  At issue was a regulation prohibiting a driver from driving if that driver was an insulin dependent diabetic.  The court concluded not only that it was not arbitrable, but also a violation of public policy:

> Section 1 of the Port Authority Act, 55 P.S. s 551 declares it to be the policy of the Commonwealth "to promote the safety and welfare of the inhabitants thereof" by the creation of port authorities for counties of the second class. Section 10, 55 P.S. s 560, provides that the use of authority facilities and its business operations are subject to rules and regulations adopted by the authority. Based on the admitted safety risks presented by the possibility of insulin shock as found by the arbitrators we conclude that the medical standard here at issue promotes the declared public policy in favor of promoting transportation safety and was within the rule-making authority of PAT.

*Div. 85, Amalgamated Transit Union v. Port Auth. of Allegheny Cty.*, 62 Pa.Cmwlth. 528, 534–35, 437 A.2d 105, 108 (1981) (footnote omitted).  The law establishes that COVID-19 vaccine requirements are matters of managerial prerogatives.

### 2.  *Vaccine mandates don't unduly infringe bargaining rights of an Act 111 unit.*

The Pennsylvania Supreme Court has adopted a slightly different standard for evaluating whether an Act 111-unit issue is a managerial prerogative.  These decisions establish that the law of Pennsylvania allows a public employer to unilaterally establish standards regarding managerial prerogatives without negotiations:

> it is equally apparent that the General Assembly had no intention or expectation that the collective bargaining process would permit public employees to set matters of public policy or participate with their public employer in administering the public enterprise. Accordingly, we construe the General Assembly's use of open-ended language in Section 1 and its silence in the Act on matters of managerial prerogative as conveying the intent that matters of managerial decision-making that are fundamental to public policy or to the public enterprise's direction and functioning do not fall within the scope of bargainable matters under Section 1. *See id.* at 465, 999 A.2d at 566 (recognizing that under Act 111, matters that are managerial in nature and implicate significant policy concerns are not subject to collective bargaining).

*City of Philadelphia v. Int'l Ass'n of Firefighters, Local 22*, 606 Pa. 447, 471–72, 999 A.2d 555, 569–70 (2010) ("City of Philadelphia").  In a second decision within days of <u>City of Philadelphia</u>, <u>Borough of Ellwood City</u> expands upon that analysis, holding:

> Consistent with the history of Act 111, as well as the above-stated policy concerns, when addressing topics which straddle the boundary between ostensibly mandatory subjects of bargaining and managerial prerogatives, we believe once it is determined that, as here, the topic is rationally related to the terms and conditions of employment, i.e., germane to the work environment, the proper approach is to inquire whether collective bargaining over the topic would unduly infringe upon the public employer's essential managerial responsibilities. If so, it will be considered a managerial prerogative and non-bargainable.

*Borough of Ellwood City*, 606 Pa. 3356,  375, 998 A.2d 589, 600 (2010).

<u>Borough of Ellwood City</u> involved an ordinance adopted by the Borough prohibiting smoking and the use of any tobacco products.  The Ellwood City Police, an Act 111 unit, contested the directive arguing that a no-smoking policy was a mandatory subject of bargaining.   The Pennsylvania Supreme Court addressed two issues raised on appeal touching upon the issues presented in the case at bar:

> (a) May a municipality, pursuant to its general police powers, enact an ordinance barring the use of tobacco products in publicly owned buildings, including employee workplaces inaccessible to the public at large, without negotiating with the exclusive representative of its employees?
> (b) Must a municipal employer bargain with the police labor organization over the ban on use of tobacco products in the workplace and in the employer's vehicles and equipment?

*Id.*, 606 Pa. at 364–65, 998 A.2d at 594.  After holding that as a general matter, the use of tobacco products was a bargainable issue, rather than address this matter as a public safety issue alone the court encapsulated the arguments entirely within a managerial prerogative analysis.  In doing so the Court cites PERA (Act 195) and reasoned:

> Furthermore, although not implicated herein, we note that PERA contains an express limitation on these topics, stating, "public employers shall not be required to bargain over matters of inherent managerial policy." 43 P.S. § 1101.702. Such topics include, but are not limited to, "such areas of discretion or policy as the functions and programs of the public employer, standards of services, its overall budget, utilization of technology, the organizational structure and selection and direction of personnel." *Id.* Moreover, it is common sense that the salutary prohibition on bargaining over inherent managerial prerogatives stems in part from the nature of the government as an employer. Not only do certain topics concern subjects which are essential to an employer's managing of its employees and the

running of its enterprise, but also there are certain matters which strike at the heart of policy decisions that directly implicate the public welfare, and, thus, should be insulated from the give-and-take of collective bargaining. As we stated in *PLRB v. State College Area Sch. Dist.,* 461 Pa. 494, 499–500, 337 A.2d 262, 264 (1975), "public employers are custodians of public funds and mandated to perform governmental functions as economically and effectively as possible. The employer in the private sector is constrained only by investors ... whereas the public employer must adhere to the statutory enactments which control the operation of the enterprise." Further, "there will be issues that would be fully legitimate in the context of a private sector labor dispute which will not be legitimate in the context of a public sector labor dispute. Public employers are in many respects more limited in what they may do vis-à-vis their employees, and those limitations must be maintained." *Washington Arbitration Case,* 436 Pa. 168, 177, 259 A.2d 437, 442 (1969).

*Id., 606 Pa. at 374–75, 998 A.2d at 599–600.* Applying this reasoning, the court noted that this review required a "case specific inquiry". *Id. at 602.* With respect to a general prohibition of the use of tobacco products in public settings the Court opined that this was a non-negotiable managerial prerogative in that it was focused of the protection of public health. However, with respect to the use of tobacco products in private settings the issue was negotiable:

> We also conclude, however, that the Ordinance, which unilaterally bans all use of all tobacco in certain non-public areas—such as smokeless tobacco use in police officer's non-public work areas and Borough vehicles and equipment, and smoking in Borough vehicles not used for mass transit and equipment—impermissibly denied Borough police officers their statutorily-guaranteed collective bargaining rights under the PLRA and Act 111 to negotiate over working conditions. … We must reconcile the ability of the Borough to enact legislation protecting the health, safety, and general welfare of its citizens with the rights of Borough police officers to engage in collective bargaining. In doing so, we conclude that, while local legislation which promotes clean air and warns of the risks of tobacco use may be laudatory, it may not serve as a barrier to negotiations over this topic when it constitutes a working condition subject to mandatory bargaining under Act 111.

*Id.* While the case specific analysis applied in <u>Borough of Ellwood City</u> concluded that the no smoking policy - as it was applicable to non-public locations – was bargainable it is certainly not comparable to the focus of the County's vaccine policy. While tobacco use may be contained to private locations, the spread of COVID is clearly distinguishable. Police work invariably results in contact with the public:

> City police officers and firefighters go to or into homes, businesses, and public places daily where they encounter City residents. Indeed, all public employees interact with members of the public in a variety of settings and circumstances. Many of those residents are children under the age of twelve who do not have the option

of getting vaccinated at the current time. Given the scientifically undisputed risk of spreading this deadly virus, the City has the right to protect the public.

*City of Newark*, A-0146-21, 2021 WL 4398457, at *7 (Super.Ct. N.J., Sept. 27, 2021).

The health, safety and general welfare of citizens remains the singular focus of the County's policy. The evidence establishes a death toll exceeding 700,000 citizens of the United States alone. Importantly, unlike the potential dangers of second-hand smoke, the COVID dangers are not eliminated by the convenient placement and use of a convenient ashtray. The spread of this virus continues in every setting – public or private – and among coworkers and the general public alike. The general public often turns to police for assistance. A primary workplace assignment for a significant portion of County police officers is the Pittsburgh airport. Every public interaction, whether it be a request for information/directions, the issuance of a citation or an arrest which requires close physical contact as well as transport in an enclosed vehicle provides a potential doorway for this virus. Every police officer's responsibilities include public interaction and a potential exposure to the invisible virus. In sum, the distinctions considered in <u>Borough of Ellwood City</u> only serve to highlight the considerations which clearly mandate a different approach with COVID vaccinations. As recently noted by the <u>City of Newark</u> court:

> In the context of a public health emergency, negotiating procedures for the implementation of a COVID-19 vaccination mandate, or the enforcement or timing of the mandate, would interfere with the managerial prerogative. COVID-19 has created an immediate and ongoing public health emergency that requires swift action to protect not only the City's employees, but the public they are hired to serve. Tens of thousands of people are sickened each day in our country. Hundreds are dying each day. Delaying, even on a temporary basis, the timelines for implementing the vaccination mandate undercuts the effectiveness of the mandate.

*Matter of City of Newark*, A-0146-21, 2021 WL 4398457, at *7. These fundamental considerations required when combatting a pandemic require the vaccine mandate.

## Conclusion

For the forgoing reasons, the MOTION TO DISMISS should be GRANTED.

Respectfully submitted,

*s/ Virginia Spencer Scott*
Virginia Spencer Scott

Assistant County Solicitor
Pa. I.D. #61647
vscott@alleghenycounty.us

*s/ Andrew F. Szefi*
Andrew F. Szefi
County Solicitor
Pa. I.D. #83747
aszefi@alleghenycounty.us

*s/ Frances Marie Liebenguth*
Frances Marie Liebenguth
Assistant County Solicitor
Pa. I.D. #314845
fliebenguth@alleghenycounty.us

ALLEGHENY COUNTY LAW DEPARTMENT
Firm #057
445 Fort Pitt Boulevard, Suite 300
Pittsburgh, Pennsylvania 15219
412-350-1173

## CERTIFICATION OF COMPLIANCE WITH CHAMBERS RULES

This BRIEF complies with this Honorable Court's Chambers Rules, II, Motions Practice (B), in that this BRIEF is limited to twenty-five pages in length, excluding exhibits and factual statements. This BRIEF is 24 pages, excluding exhibits and factual statements.

Respectfully submitted,

s/ Virginia Spencer Scott
Virginia Spencer Scott
Assistant County Solicitor
Pa. I.D. #61647
vscott@alleghenycounty.us

ALLEGHENY COUNTY LAW DEPARTMENT
Firm #057
445 Fort Pitt Boulevard, Suite 300
Pittsburgh, Pennsylvania 15219
412-350-1173